AO 91 (Rev. 11/11) Criminal Complaint

# UNITED STATES DISTRICT COURT
for the
Central District of California

| | |
|---|---|
| United States of America<br>v.<br>TYLER TENNIGKEIT,<br>Defendant(s) | Case No. 19MJ00054 |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of December 22, 2018, in the county of Los Angeles in the Central District of California, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 922(g)(1) | Felon in Possession of Ammunition |

This criminal complaint is based on these facts:

*Please see attached affidavit.*

☒ Continued on the attached sheet.

/S/
Complainant's signature

Valerie H. Atwood, Special Agent
Printed name and title

Sworn to before me and signed in my presence.

Date: 1/8/19

City and state: Los Angeles, California

MICHAEL R WILNER
Judge's signature

Hon. Michael Wilner, U.S. Magistrate Judge
Printed name and title

FILED CLERK, U.S. DISTRICT COURT
JAN - 8 2019
CENTRAL DISTRICT OF CALIFORNIA
BY          DEPUTY

## AFFIDAVIT

I, Valerie H. Atwood, being duly sworn, hereby declare and state as follows:

### I. PURPOSE OF AFFIDAVIT

1. This affidavit is made in support of a criminal complaint and arrest warrant for Tyler TENNIGKEIT ("TENNIGKEIT") for a violation of Title 18, United States Code, Section 922(g): Felon in Possession of Ammunition.

2. This affidavit is also made in support of an application for a warrant to search a digital device (the "SUBJECT DEVICE"), in the custody of the Corona Police Department in Corona, California, as described more fully in Attachment A.

3. The requested search warrant seeks authorization to seize evidence, fruits, or instrumentalities of violations of Title 18, United States Code, Sections 922(g) (Felon in Possession of a Firearm and Ammunition), Title 18, United States Code, Sections 1344 (Bank Fraud), and Title 18, United States Code, Sections 1029 (Access Device Fraud) (the "Subject Offenses"), as described more fully in Attachment B. Attachments A and B are incorporated herein by reference.

4. The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested complaint, arrest warrant, and search warrant, and does not purport to set forth

all of my knowledge of or investigation into this matter. Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

## II. BACKGROUND ON THE AFFIANT

5. I am a Special Agent with the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF"), and have been so employed since January 2017. As an ATF Special Agent, I have received training in federal firearms and narcotics laws and regulations. I am a graduate of the Federal Law Enforcement Training Center Criminal Investigator Training Program as well as the ATF Special Agent Basic Training Program. My duties include the investigation of criminal violations of federal firearms laws. I have participated in several investigations involving individuals illegally possessing and/or trafficking in firearms. I have also interviewed confidential informants, witnesses, cooperating defendants, criminal defendants, and other persons engaged in violations of federal firearms laws. Prior to working for the ATF, I received a Bachelor of Arts degree in Philosophy from the University of Rochester, a Master of Arts degree in Middle Eastern Studies from the University of Texas at Austin, and a Master of Arts degree in International Security. I am currently assigned to the ATF Riverside, California Field Office.

## III. SUMMARY OF PROBABLE CAUSE

6. On or about December 22, 2018, TENNIGKEIT was stopped in a car after Corona Police Department officers saw TENNIGKEIT

walk out of a Federal Firearms Licensee ("FFL") carrying a box containing approximately 1,120 rounds of ammunition. The officers previously identified TENNIGKEIT as a convicted felon. The officers also saw a loaded handgun in plain view on the rear passenger seat of the car. During a Mirandized interview, TENNIGKEIT told the officers that he built the handgun and that he purchased the ammunition from the FFL.

## IV. STATEMENT OF PROBABLE CAUSE

7. Based on my review of law enforcement reports, conversations with other law enforcement agents, and my own knowledge of the investigation, I am aware of the following:

### A. TENNIGKEIT Ordered Ammunition with a Stolen Credit Card

8. On or about December 21, 2018, the Corona Police Department ("CPD") received a call from Dale Robert Carlson ("Carlson"), a licensed federal firearms dealer, regarding an online order for ammunition that was purchased with a suspected stolen credit card. The purchaser's name was listed as "Tyler Tenngkiet" and was for 500 rounds of Hydra-Shok JHP Federal Premium 9mm ammunition, 420 rounds of 5.56x45 caliber rifle ammunition, and 200 rounds of JHP Federal Premium .45 ACP ammunition. Carlson explained to the officers that part of his duties as a licensed firearms dealer is to act as a "middle man" for ammunition orders, in that customers place orders online or over the telephone and then pick up the order at Carlson's place of business.

3

9.     Carlson told CPD Officer Placencia that he recognized the name on "Tyler Tenngkiet" from previous orders, including an ammunition purchase in August 2018 and another one in October 2018 where the purchaser picked up the orders without incident each time, and an ammunition purchase in November 2018 that Carlson learned was purchased using a stolen credit card.  The November 2018 purchase was cancelled.  Carlson told Officer Placencia that after he received the package of ammunition for "Tyler Tenngkiet," he contacted the ammunition vendor via email to ask if the credit card used was stolen.  The vendor replied via email and stated that they received a chargeback for the order and that the credit card used in the order for "Tyler Tenngkiet" was stolen.  Officer Placencia conducted a records check on "Tyler Tenngkiet" by calling dispatch on December 21, 2018.  Dispatch determined that there was one close match, TENNIGKEIT, who had prior felony convictions, including one for being a felon in possession of a firearm.  Carlson could only provide a general description of the person he knew as Tenngkiet: Caucasian male with a medium-build.  Officer Placencia obtained a photograph of TENNIGKEIT using law enforcement databases, which matched Carlson's general description of Tenngkiet.  Carlson told Officer Placencia that the person he knew as Tenngkeit was scheduled to pick up the ammunition from his business on South Buena Vista Avenue in Corona, California on December 22, 2018 at 3:00 p.m.

4

### B.   TENNIGKEIT'S Arrest With a Firearm and Ammunition

10.   On or about December 22, 2018, Officer Placencia and Officer Nabi went to Carlson's business and spoke to Carlson. Carlson showed the officers the package ordered by and for "Tyler Tenngkiet." The ammunition was inside of a brown cardboard shipping box. The officers then conducted surveillance at Carlson's business.

11.   At approximately 5:27 p.m., the officers saw TENNIGKEIT arrive at Carlson's business. Carlson contacted Officer Placencia via cell phone and provided a physical description of TENNIGKEIT and a description of the car that he arrived in. The vehicle was a silver Lexus CT200h (license plate number 7MHU705), which was later discovered to be a "Lyft" transportation car. Carlson then told the officers that TENNIGKEIT picked up the ammunition and was on his way back to the car that he arrived in.

12.   The officers saw the car leave Carlson's business and followed it. While the car was on the 900 block of Silvercreek Road, Officer Nabi turned on his overhead lights and initiated a high-risk vehicle stop. The officers ordered the driver and the rear passenger, later identified as TENNIGKEIT, out of the car.

13.   After both the driver and TENNIGKEIT were detained, the officers saw in plain view a handgun in the rear seat on the passenger side of the car where TENNIGKEIT was sitting. Also in the rear passenger seat was the package that TENNIGKEIT picked up from Carlson's business. The driver, identified as Sonny Singh, told the officers that he did not know TENNIGKEIT and

that Singh was a "Lyft" driver. Singh gave the officers consent to search the car.

14. The officers recovered the following from the car:

   a. One Colt Model M1991A1 .45 caliber handgun (Serial Number CP14728) found loaded lying in plain view on the rear seat on the passenger side of the vehicle where TENNIGKEIT was sitting;

   b. Eight rounds of .45 ACP ammunition found loaded in the Colt handgun;

   c. One box containing the ammunition that TENNIGKEIT purchased from Carlson:

      i. Approximately 500 rounds of Hydra-Shok JHP Federal Premium 9mm ammunition,

      ii. Approximately 420 rounds of 5.56x45 caliber rifle ammunition,

      iii. Approximately 200 rounds of JHP Federal Premium .45 ACP ammunition;

   d. The SUBJECT DEVICE, which is a black Samsung cell phone further described in Attachment A and was found on the floorboard of the rear driver's side seat; and

   e. Five access devices: four Visa debit cards, two Mastercard debit cards, and one American Express card, all without TENNIGKEIT's name on them.

15. Based on my training and experience, I know that credit, debit and gift cards can be re-encoded with stolen access device data. The access device investigation is ongoing.

### C. Interview of Sonny Singh – "Lyft" Driver

16. Officer Nabi interviewed Singh. Singh told Officer Nabi that he does not recognize TENNIGKEIT and that he had never had TENNIGKEIT as a customer before. Singh told Officer Nabi that he checks the back seat of the vehicle after every customer to ensure that they did not leave anything behind. Singh stated that the firearm was not in the back seat after Singh dropped off the customer before TENNIGKEIT.

### D. Post-Miranda Interview of TENNIGKEIT

17. After TENNIGKEIT was transported to the Corona Police Station and after being advised of his Miranda rights, TENNIGKEIT told the officers that he built the handgun himself between four to six months ago and that he bought the ammunition from Carlson for someone else.

### E. Criminal History

18. On January 7, 2019, I reviewed the criminal history for TENNIGKEIT and learned that TENNIGKEIT has previously been convicted of the following felony crimes, each punishable by a term of imprisonment exceeding one year:

   a. On or about July 28, 2015, transportation/possession of a controlled substance for sale, in violation of California Health and Safety Code Section 11379(A), in the Superior Court for the State of California, County of Orange, Case Number #15CF0551; and

   b. On or about May 18, 2011, felon in possession of a firearm, in violation of California Penal Code Section 12021(D)(1), and manufacturing a dangerous weapon, in violation

of California Penal Code Section 12020(A)(1), in the Superior Court for the State of California, County of Orange, Case #11CF1333.

**F.   Interstate Nexus Determination**

19.   On or about December 26, 2018, ATF Special Agent and Interstate Nexus Expert, Special Agent Paul Kirwan examined photographs of the Colt .45 caliber handgun, eight rounds of .45 ACP ammunition, 500 rounds of Hydra-Shok JHP Federal Premium 9mm ammunition, 420 rounds of 5.56x45 rifle ammunition, and 200 rounds of JHP Federal Premium .45 ACP ammunition. Special Agent Kirwan determined that the ammunition was manufactured outside of the State of California and also determined that parts of the completed handgun were manufactured by Colt, which is located outside of the State of California. Because the handgun parts and ammunition were found in California, I believe that they traveled in and affected interstate commerce.

**V.   TRAINING AND EXPERIENCE ON FIREARMS OFFENSES**

20.   From my training, personal experience, and the collective experiences related to me by other law enforcement officers who conduct who conduct firearms investigations, I am aware of the following:

   a.   Persons who possess, purchase, or sell firearms generally maintain records of their firearm transactions as items of value and usually keep them in their residence, or in places that are readily accessible, and under their physical control, such in their digital devices. It has been my experience that prohibited individuals who own firearms

illegally will keep the contact information of the individual who is supplying firearms to prohibited individuals or other individuals involved in criminal activities for future purchases or referrals. Such information is also kept on digital devices.

      b. Many people also keep mementos of their firearms, including digital photographs or recordings of themselves possessing or using firearms on their digital devices. These photographs and recordings are often shared via social media, text messages, and over text messaging applications.

      c. Those who illegally possess firearms often sell their firearms and purchase firearms. Correspondence between persons buying and selling firearms often occurs over phone calls, e-mail, text message, and social media message to and from smartphones, laptops, or other digital devices. This includes sending photos of the firearm between the seller and the buyer, as well as negotiation of price. In my experience, individuals who engage in street sales of firearms frequently use phone calls, e-mail, and text messages to communicate with each other regarding firearms that the sell or offer for sale. In addition, it is common for individuals engaging in the unlawful sale of firearms to have photographs of firearms they or other individuals working with them possess on their cellular phones and other digital devices as they frequently send these photos to each other to boast of their firearms possession and/or to facilitate sales or transfers of firearms.

## VI. TRAINING AND EXPERIENCE REGARDING MAIL AND IDENTITY THEFT

21. Based on my training and experience and information obtained from other law enforcement officers who investigate bank fraud and identity theft, I know the following:

    a. It is common practice for individuals involved in identity theft, bank fraud, and access device fraud crimes to possess and use digital devices to facilitate, conduct, and track fraudulent transactions and identity theft. Suspects often use digital devices to perpetrate their crimes due to the relative anonymity gained by conducting financial transactions electronically or over the internet. They often employ digital devices for the purposes, among others, of: (1) applying online for fraudulent credit cards; (2) obtaining or storing personal identification information for the purpose of establishing or modifying fraudulent bank accounts and/or credit card accounts; (3) using fraudulently obtained bank accounts and/or credit card accounts to make purchases, sometimes of further personal information; (4) keeping records of their crimes; (5) researching personal information, such as social security numbers and dates of birth, for potential identity theft victims; and (6) verifying the status of stolen access devices.

    b. It is common for identity thieves, and individuals engaged in bank fraud, and access device fraud to use equipment and software to print credit and identification cards, to create magnetic strips for credit cards, to use embossing machines to create credit cards, to use laser printers

10

to create checks, and to use magnetic card readers to read and re-encode credit cards. Software relevant to such schemes and records of purchases of such equipment can often be found on digital devices.

        c.    Individuals who participate in identity theft, bank fraud, and access device fraud schemes often have co-conspirators, and often maintain telephone numbers, email addresses, and other contact information and communications involving their co-conspirators in order to conduct their business. Oftentimes, they do so on their digital devices. Suspects often use their digital devices to communicate with co-conspirators by phone, text, email, and social media, including sending photos.

### VII. TRAINING AND EXPERIENCE ON DIGITAL DEVICES

22.    As used herein, the term "digital device" includes the SUBJECT DEVICE.

23.    Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that the following electronic evidence, inter alia, is often retrievable from digital devices:

        a.    Forensic methods may uncover electronic files or remnants of such files months or even years after the files have been downloaded, deleted, or viewed via the Internet. Normally, when a person deletes a file on a computer, the data contained in the file does not disappear; rather, the data remain on the hard drive until overwritten by new data, which may only occur after a long period of time. Similarly, files viewed on the

Internet are often automatically downloaded into a temporary directory or cache that are only overwritten as they are replaced with more recently downloaded or viewed content and may also be recoverable months or years later.

  b. Digital devices often contain electronic evidence related to a crime, the device's user, or the existence of evidence in other locations, such as, how the device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials on the device. That evidence is often stored in logs and other artifacts that are not kept in places where the user stores files, and in places where the user may be unaware of them. For example, recoverable data can include evidence of deleted or edited files; recently used tasks and processes; online nicknames and passwords in the form of configuration data stored by browser, e-mail, and chat programs; attachment of other devices; times the device was in use; and file creation dates and sequence.

  c. The absence of data on a digital device may be evidence of how the device was used, what it was used for, and who used it. For example, showing the absence of certain software on a device may be necessary to rebut a claim that the device was being controlled remotely by such software.

  d. Digital device users can also attempt to conceal data by using encryption, steganography, or by using misleading filenames and extensions. Digital devices may also contain "booby traps" that destroy or alter data if certain procedures

are not scrupulously followed. Law enforcement continuously develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

24. Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it is not always possible to search devices for data during a search of the premises for a number of reasons, including the following:

    a. Digital data are particularly vulnerable to inadvertent or intentional modification or destruction. Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which may take substantial time, particularly as to the categories of electronic evidence referenced above.

    b. Digital devices capable of storing multiple gigabytes are now commonplace. As an example of the amount of data this equates to, one gigabyte can store close to 19,000 average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

25. Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

## VIII.   CONCLUSION

26. For all of the reasons described above, there is probable cause to believe that Tyler TENNIGKEIT has committed a violation of 18 U.S.C. § 922(g)(1): Felon in Possession of a

13

Firearm and Ammunition. There is also probable cause that the items to be seized described in Attachment B will be found in a search of the SUBJECT DEVICE described in Attachment A

_____
Valerie H. Atwood, ATF Special Agent

Subscribed to and sworn before me this 8th day of January, 2019.

_____
MICHAEL R WILNER
UNITED STATES MAGISTRATE JUDGE